FILED30 SEP '22 14:47USDC-ORP

**Shawn Orin Higley**
1470 NW Glisan Avenue. Apt. 1250
Portland, Oregon 97209
Telephone: 503.747.8601
Email: higleydataservices@gmail.com

Plaintiff, Pro Se

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ORGON
PORTLAND DIVISION

| | |
|---|---|
| **SHAWN ORIN HIGLEY**, an individual, | Case No. 3:22-CV-1474-IM |
| Plaintiff, | COMPLAINT |
| v. | |
| **NEWREZ, LLC and SHELLPOINT PARNTERS, LLC,** | |
| Defendants. | |

Plaintiff Shawn Orin Higley complains of Newrez, LLC and Shellpoint Partners, LLC.

## JURISDICTION AND VENUE

Venue is proper within the District of Oregon because all the events giving rise to this complaint

occurred in this judicial district, and to Plaintiff's knowledge, Defendant NewRez, LLC's

principal place of business is Fort Washington, PA and Defendant Shellpoint Partners, LLC's

principal place of business is in New York, NY.  Both NewRez and Shellpoint Partners, LLC

operate business under the laws of the State of Oregon.  28 U.S.C. § 1391(b)(2).  This Court has

subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

1.  Plaintiff Shawn Orin Higley ("Plaintiff") is resident of Portland, Multnomah County,

Oregon.

Page 1 – COMPLAINT

99793

2.      Defendant Newrez, LLC dba Shellpoint Partners, LLC is a foreign limited liability company, organized under the laws of the State of Pennsylvania, doing business in the state of Oregon.

## PRELIMINARY FACTS

3.      On or about March 15, 2021, Claimant entered into a resolution of his marital dissolution proceedings in Multnomah County Circuit Court, Oregon.  At that time, following the confirmation of his spousal support amount, he engaged the services of Quontic to refinance the property at 9420 NW Kaiser Road, Portland, Oregon 97231, which would allow claimant to pay his ex-wife's equity in the approximate amount of $900,000 in the property and retain ownership of the Property.  Time was of the essence, given the settlement terms call for the Property to be listed on May 14, 2021, which would have made refinancing the Property impossible.

4.      Fortunately, as a result of the listing realtor's fault, the listing of the Property was delayed, and allotted Claimant more time to complete the refinance process.

5.      On or about June 6, 2021, Quontic discovered the reported late payment by NewRez, LLC/Shellpoint Mortgage, and denied Claimant's application.  Claimant had immediately contacted Shellpoint to correct the misinformation; however, Shellpoint did not take action until Claimant filed his Consumer Financial Protection Bureau Complaint in July, 2021.

6.      By the time, Shellpoint corrected the inaccurate reporting on August 18, 2021, Quontic denied Claimant's application, and Claimant had been sued by his ex-wife for contempt related to the listing of the Property (due to Claimant's failure to refinance and pay ex-wife's equity and remove her name from the mortgage.

7.      Quontic had received Claimant's application, processed it, and sent the file to their underwriting department.

Page 2 – COMPLAINT

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

8.    The late reporting has caused the stall of my refinance with Quontic.  Refinance is the only path I had to retaining ownership of my home and removing my ex-wife from the mortgage note pursuant to a General Judgment of Dissolution of Marriage filed in Multnomah County Circuit Court Case No. 20DR01864 on June 8, 2021.

9.    Since an offer was made, and I had no choice to accept due to language in the General Judgment, the home was forcibly sold on May 5, 2022.

10.    I have previously addressed this issue with NewRez dba Shellpoint and filed a complaint with the Consumer Financial Protection Bureau and Better Business Bureau.  In their response dated August 18, 2021, New Rez dba ShellPoint has accepted responsibility and admitted liability for the inaccurate reporting.

## FEDERAL CLAIMS

## GENERAL CREDIT REPORTING INDUSTRY ALLEGATIONS

11.    Plaintiff alleges that Newrez is familiar with credit reporting industry standards and subscribes thereto.

12. Plaintiff alleges that Newrez understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if Newrez reported in accordance with the recognized industry standard.

13. Plaintiff alleges that all actions alleged herein by Newrez was done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff as it related to the IPO offering.

Page 3 – COMPLAINT

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email:  higleydataservices@gmail.com

22. In the alternative, Plaintiff alleges that Newrez's actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

23. FICO Inc. ("FICO") is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

24. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

25. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

26. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

28. There are 28 FICO Scores that are commonly used by lenders.

29. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

30. The three largest CRAs are Equifax, Experian, and TransUnion.

31. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

32. There are five key factors that a FICO Score considers: 1) Payment history; 2) Amount of Debt; 3) Length of Credit History; 4) New Credit; and 5) Credit Mix.

33. Each of the five factors is weighted differently by FICO.

34. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

35. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

36. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

37. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

FICO Score's are entirely dependent upon information provided by Data Furnishers ("DFs") to CRAs.

39. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both "Chapters" have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place. b. Metro 2

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

40. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

41. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

42. The Consumer Data Industry Association's ("CDIA") Metro 2 format is the credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.

43. Therefore, the credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

The CDIA is the expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following: a. The CDIA offers an FCRA certificate program for all CRAs b. The CDIA offers an FCRA awareness program for all CRAs. c. The CDIA offers an FCRA certificate program for DFs. d. The CDIA offers an FCRA awareness program for DFs. e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields. f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion. g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

45. The CDIA's Metro 2 is accepted by all CRAs.

Page 6 – COMPLAINT

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

46. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's Credit Reporting Resource Guide ("CRRG").

47. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

48. The CRRG is not readily available to the public. It can be purchased online for approximately $229.45.

49. Even if a buyer is ready and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

50. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA

The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk, resulting in less favorable lending terms. c. e-Oscar

53. E-OSCAR is the web based Metro 2 compliant system developed by the CRAs that enables DFs and CRAs to create and respond to consumer credit disputes.

54. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-Oscar to the DF.

55. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file, e.g. "Account Type - 07" (07 in Metro 2 refers to a Charge Account)

Page 7 – COMPLAINT

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

## NEWREZ/SHELLPOINT'S ERRONEOUS CREDIT REPORTS RELATING TO
## PLAINTIFF'S MORTGAGE ACCOUNT  (THE "ACCOUNT")

56. Plaintiff opened the mortgage account with NewRez for the property at 9420 NW Kaiser Road, Portland, Oregon 97231.

57. On or about September 28, 2020, Plaintiff requested forbearance of his mortgage payments due to requested relief under the COVID 19 Pandemic.

58. A Credco Credit Report dated June 2021,  reported the following inaccurate, derogatory information for the above-referenced account number as of October 2020:

The 60-89 reporting in terms of length is incorrect in terms of calculating the late October 2020 payment, by your set of facts:

1. The one and only payment (outside of forbearance) that was not made was the October 2020 payment.

2. The reporting of the late payment occurred in November 2020.  This would have been a 30-day late payment, not 60, and certainly not 60-89.

3. The loan was in transfer from Newrez/Shellpoint to Specialized Loan Servicing in October 2020.

59. It was not accurate for Newrez to report the account 60- 89 days late. the true and correct statuses of the Account was "in forbearance".

//

//

//

//

Page 8 – COMPLAINT

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com

## FIRST CLAIM FOR RELIEF

INJUNCTIVE RELIEF FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT 15

U.S.C. 1681, ET SEQ.

60.    Defendant has subjected Plaintiff to the deprivation of his rights, privileges, or

immunities secured by the Constitution and laws, by engaging in misconduct such as the

misreporting of the October 2020 payment for Plaintiff's mortgage.

## ECONOMIC DAMAGE SUMMARY

61.    In summary, Plaintiff incurred economic damages totaling $617,558, as a result of losing

the ability to purchase the property at 9420 NW Kaiser Road, Portland, Oregon 97231 because of

inaccurate reporting of a late payment and the subsequent denial of his refinance application as a

result.  Shellpoint has admitted liability.

## PRAYER FOR RELEIF

WHEREFORE, Plaintiff prays for judgment as follows:

• That the practices and procedures of Newrez complained of herein be determined and

adjudged to be in violation of the rights of Plaintiff.

• That, in accordance with 15 U.S.C. §§ 1681n(a) and 1681o(a), judgment be entered in

favor of Plaintiff, and against Newrez for statutory and/or punitive damages in amounts to be

determined at trial,

• That, in accordance with 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2), Plaintiff be

awarded the costs of this action together with reasonable attorney's fees as the Court may

determine,

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email:  higleydataservices@gmail.com

• That Plaintiff be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem equitable and just.

Dated this 30th day of September, 2022.

Shawn Orin Higley, Pro Se Plaintiff
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Telephone: 503.747.8601

Email: higleydataservices@gmail.com

Shawn Orin Higley
1470 NW Glisan Street, Apt. 1205
Portland, Oregon 97209
Phone: (503) 747-8601
Email: higleydataservices@gmail.com